UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
IQBAL NAZ SULEHRIA,
                           :
             Plaintiff,        REPORT & RECOMMENDATION
                           :
       -against-          05 Civ. 4486 (SHS)(MHD)
                           :
THE CITY OF NEW YORK et al.,
                           :
             Defendants.
-------------------------------x

TO THE HONORABLE SIDNEY H. STEIN, U.S.D.J.:


    Plaintiff Iqbal Naz Sulehria is employed by the New York City Department of Correction ("DOC") as a legal coordinator. He has commenced four separate lawsuits in this court between 2002 and 2006, all now consolidated into one, to complain that the Department and numerous officials and employees of the DOC have discriminated against him because of his religion and national origin and retaliated against him for filing complaints. The complained-of discrimination and retaliation allegedly took numerous forms, including, among other things, requiring intrusive searches of his person, denying him bathroom access, exposing him to petty insults and harassment, and denying him appointment to higher ranking City positions. Based on these contentions, he has asserted claims under 42 U.S.C. § 1983 for violation of his constitutional rights under the First and Fourth Amendments, the

1

Equal Protection Clause, and the Due Process Clause; claims under Title VII and parallel state and local anti-discrimination laws for disparate treatment, creation of a hostile-work environment, and retaliation; and a conspiracy claim under 42 U.S.C. § 1985. Naming thirteen DOC employees as well as the City and the DOC as defendants, he seeks compensatory and punitive damages as well as injunctive relief.

At the conclusion of discovery, defendants have moved for what they style as partial summary judgment, although the substance of the motion papers reflects some conflation by their counsel between a Rule 12(b)(6) dismissal and summary judgment. See Jones v. UNUM Life Ins. Co., 223 F.3d 130, 136 (2d Cir. 2000) (construing motion based on its substance rather than its label). They seek dismissal -- either for inadequacy in pleading or for lack of proof -- of all claims for non-promotion, all claims of retaliation, all claims under section 1983, all claims under the New York State Executive Law and the New York City Human Rights Law[1], all Title VII claims

---

[1] Although defendants' memorandum of law seems, at first blush, to challenge only plaintiff's claims under the New York State Human Rights Law (see Defs.' Mem. at 23 (section entitled "Plaintiff's SHRL Claims of Discrimination and Retaliation are Barred by the Doctrines of Collateral Estoppel and Election of Remedies")), their brief makes clear that the election-of-remedies arguments they advance apply with equal force to claims under the New York City Human Rights Law. (Id. ("an aggrieved

against individuals, and all claims against DOC Commissioner Martin Horn. In addition they ask that the DOC be dismissed as a non-suable entity, and they argue for the first time in their reply papers for the dismissal of plaintiff's conspiracy claim. In short, defendants seek to dismiss all claims other than the hostile work-environment claims and certain discrimination claims under Title VII against the City. Plaintiff appears to oppose the motion except in two narrow respects.[2]

For the reasons that follow, we recommend that the motion be granted in part.

A. The Plaintiff's Factual Allegations

In plaintiff's amended complaint, he lists a litany of

---

individual who has chosen to institute an administrative proceeding with the State Division of Human Rights or with the City Commission on Human Rights is barred from subsequently raising a claim under the CHRL or the SDHR in court.") (emphasis in original)). Plaintiff has stated discrimination claims under both New York State and New York City law (Defs.' Ex. A, Am. Compl. ¶¶ 82, 83) and we thus construe defendants' memorandum as challenging claims under both provisions. At any rate, as discussed in section B ("Defendants' Motion"), in their reply brief, defendants purport to withdraw these arguments, and the arguments are, at any rate, meritless.

[2]   See infra pp. 18-19, 78.

incidents -- supposedly inspired at least in part by the events of September 11, 2001 (Defs.' Ex. A, Am. Compl. ¶¶ 1-3) -- involving petty or not-so-petty harassment of him by numerous DOC personnel during the period from May 2002 to January 2007, as well as a number of complaints made by him to the DOC and alleged instances of retaliation by the Department. He names as defendants not only the City and DOC, but also DOC Commissioner Horn; Alan Vengersky, the DOC Assistant Commissioner for Personnel; Frank Squillante, the Warden of the Eric M. Taylor Center ("EMTC"); Nancy Acevado, the Deputy Warden, Commanding Officer of the Bellevue Hospital Prison Ward; Arthur Olivari, the Deputy Warden of Security at the EMTC; Edwin M. Knight, the Deputy Warden for Programs at the EMTC;[3] Larry Triplett, the Deputy Director of Law Libraries at EMTC; Karen Powell, the Director of Law Libraries at EMTC; Melinda D. Thomas, a legal coordinator at the EMTC; Corrections Officer Carlos J. Alves; DOC Captain Robert A. Basile; and Correction Officer Linda Murdaugh. (Id. ¶¶ 9-22).

---

[3]   In the caption of the current version of the complaint, plaintiff actually names an "Edward M. Knight" as defendant, but defendants point out in their motion papers that defendant Knight's first name is actually "Edwin." (Defs.' R. 56.1 Statement at 1 n.1). Earlier versions of the pro se complaint correctly name "Edwin M. Knight" as defendant, (e.g., Compl. ¶ 20, Defs.' Ex. L at 2), so we assume this was an error by plaintiff's counsel.

4

We briefly summarize the plaintiff's allegations about his treatment at the hands of these individuals and others not named as defendants.

According to plaintiff, on May 2, 2002, while assigned to the Vernon C. Bain Center ("VCBC") at Rikers Island, he was subjected to a body cavity search when entering the facility, assertedly by defendant Alves, and despite the presence of defendant Basile. (Id. ¶ 26). According to plaintiff, on June 17, 2002, he filed a notice of claim about this incident. (Id. ¶ 27). He also notified Luis R. Burgos, the Deputy Commissioner of the DOC Equal Employment Opportunity Office. (Id.).

On December 2, 2002, while he was entering the North Infirmary at Rikers Island, his belongings were allegedly searched, although he does not identify the person responsible. (Id. ¶ 28). He says that he reported the incident to Deputy Commissioner Burgos. (Id.).

Plaintiff alleges that in early September 2003, while at the Bellevue prison facility, he was denied access to a staff bathroom by a security officer who had a key. (Id. ¶ 29). He states that he informed defendant Acevado as well as a Captain Moore and a Captain Rodriguez and, on or about September 3, 2003, filed a complaint

5

with the office of Commissioner Martin Horn, but that Horn did nothing to investigate his complaint. (Id.).

On September 13, 2003, unidentified employees of the New York City Health and Hospital Corporation ("HHC") allegedly denied him access to the Bellevue bathroom, assertedly in retaliation for his earlier complaint against DOC personnel for the May 2002 search. (Id. ¶ 30). He says that as a result he had to use the bathroom at a nearby fast food restaurant, in violation of DOC rules. (Id.).

Three days later, in what he characterizes as further retaliation for his 2002 complaint, plaintiff claims that he was again denied a key to use a bathroom, causing him to suffer bladder damage. (Id. ¶ 31). He blames defendants Triplett, Powell, and Acevado for this incident.[4] (Id.).

He claims in general terms that, as additional acts of retaliation, from 2004 until May 2005, he was "exiled to various buildings where he was exposed to inhumane working conditions such as unavailable clean drinking water, and a lack of adequate air

---

[4]   In this paragraph of the complaint, he refers to a "Nancy Acevedo" as having been implicated in the denial of the bathroom key. (Am. Compl. ¶ 31). We assume that this is a typographical error and was intended to be a reference to defendant Acevado.

conditioning in the summer and heat in the winter." (<u>Id.</u> ¶ 32). He further complains that in May 2004, again to retaliate against him, defendants Triplett and Powell denied his overtime requests. (<u>Id.</u> ¶ 33). He also reports that on May 26, 2004, he complained to an Assistant Commissioner Bacon about the denial of overtime, and that Bacon did not act on that complaint. (<u>Id.</u> ¶ 35).

Plaintiff reports that on May 14, 2004, a fellow legal coordinator, Jeffrey St. Clair, left an insulting note on the door of plaintiff's locker, located in plaintiff's office. (<u>Id.</u> ¶ 34). According to plaintiff, this action reflected abuse and retaliation. (<u>Id.</u>).

He next complains that, in addition to acts of retaliation by corrections personnel, "there were also inmates enlisted to join an informal but growing conspiracy to persecute Sulehria." (<u>Id.</u> ¶ 36). Thus, he says, on June 29, 2004, he had an encounter with an inmate who "verbally assault[ed]" him, and that defendant Murdaugh did not intervene. (<u>Id.</u>). Indeed, he complains, Murdaugh wrote down an incorrect inmate identification number and then told plaintiff to "shut up," calling him a "bastard Muslim." (<u>Id.</u>).

On or about August 17, 2004, plaintiff recounts, while at the

EMTC on Rikers Island, he filed a request for a bathroom key, but was refused by a Corrections Officer James Schott, who told him that he was not allowed a key because he was "a fucking Muslim, a security risk." (Id. ¶ 37). He blames Schott and a Security Captain Cruz for the denial of the key, and reports that both defendants Squillante and Olivari affirmed the denial of a bathroom key. (Id.).

On September 1, 2004, defendant Triplett assertedly accused plaintiff of misconduct and incompetence on the job without justification, and insulted plaintiff, calling him a "Pakistani shit." (Id. ¶ 38). On October 14 and 15, 2004, at the same EMTC facility, he was allegedly subjected to two invasive searches, the first time by an unidentified correction officer who also insulted his religion, and the second time by an Officer Metzger. (Id. ¶¶ 39-40). Plaintiff states that he complained to Security Captain Cruz about the first incident, but Cruz did nothing. (Id.).

On October 26, 2004, Sulehria filed a complaint with the New York State Division of Human Rights. (Id. ¶ 41). On May 11, 2005, he received a right-to-sue letter in connection with this charge. (Id.).

8

He alleges that in October 2004, he was denied a promotion to the Director of Planning and Administration of DOC. (Id. ¶ 42). He asserts that this adverse action was in retaliation for his prior complaints. (Id.).

In November 2004, he was exposed to what he calls "an escalating wave of discrimination, retaliation, and harassment by [defendants] Knight and Murdaugh." (Id. ¶ 43). He claims that he was unjustifiably accused of misconduct, and that someone left garbage, urine, and dirty dishes in his work area. (Id.). He links defendants Knight and Murdaugh to these incidents. (Id.). He also accuses defendants Knight, Triplett, and Squillante of what he describes as "petty institutional harassment" in November 2004 in the form of false complaints that plaintiff had failed to maintain a typewriter logbook. (Id. ¶ 44).

Plaintiff alleges that, in February 2005,[5] his office at the EMTC was ransacked, the locks on his locker were clipped off, and some documents were stolen from him. (Id. ¶ 45). He alleges that he notified defendant Squillante and the police about this incident. (Id.).

---

[5] Plaintiff cites February 2004 (id. ¶ 45), but the chronology of the complaint suggests that this is a typographical error.

9

In March 2005, plaintiff filed two notices of claim with the City. (Id. ¶ 46). That same month, defendants Squillante and Knight allegedly criticized him for coming in to work "early" and insulted him. (Id. ¶ 47). They also coerced him, reportedly, to accept reassignment to another facility. (Id.).

Plaintiff also states that, on March 16 and 17, 2005, Murdaugh and possibly someone else left offensive photos on his desk: one of Osama Bin Laden with plaintiff's face superimposed, and one of a dead soldier with plaintiff's ID photo attached. (Id. ¶¶ 48-49; see also Pl.'s Ex. 9, 10). Five days later, on March 22, defendant Murdaugh, in the presence of a Captain Burnett, reportedly threatened him, saying "I will get you." (Id. ¶ 50). Four days after that, on March 26, Murdaugh allegedly attempted to assault him and wrote a threatening note in the EMTC Law Library log book. (Id. ¶ 51). According to plaintiff, she "continued to harass Sulehria, until the police were called." (Id.).

Plaintiff states that he complained about Murdaugh's behavior, and that on March 30, 2005, he was transferred temporarily to another facility. (Id. ¶ 52). He reports that he returned to EMTC on May 11, 2005, but that no remedial action was taken against Murdaugh. (Id.). On May 16, 2005, someone allegedly left a picture

10

of a rat on his desk. (Id. ¶ 53).

In June 2005, he received notice from defendant Powell that any leave requests must be made two weeks in advance of the requested leave. (Id. ¶ 54). He claims that this was an instance of discrimination based on his religion (since non-Muslims were not required to provide such early notice) as well as retaliation for his earlier complaints. (Id.).

He reports that, on August 16, 2005, plaintiff asked defendant Knight to sign the law library log, as required, but Knight refused without basis and pointed his middle finger at plaintiff. (Id. ¶ 55). On August 26, 2005, defendant Squillante told plaintiff that Luis Burgos had ordered that he be disciplined for a charge -- groundless, according to plaintiff -- that he had made derogatory comments about defendant Murdaugh. (Id. ¶ 56). He eventually filed an Article 78 proceeding to avoid being disciplined. (Id.).

On October 26, 2005, plaintiff filed two charges with the Equal Employment Opportunity Commission for which he received right-to-sue letters on February 4, 2006. (Id. ¶ 57). On November 3, 2005, he filed another notice of claim with the City. (Id. ¶ 58).

11

According to plaintiff, on November 16, 2005, an inmate verbally abused him. (Id. ¶ 59). Plaintiff claims that he reported this to a Captain Hinds (who is not a defendant), but nothing was done about it. (Id.).

On December 19, 2006, some notes were allegedly stolen from plaintiff's diary that referred to DOC's hostile and discriminatory treatment of him. (Id. ¶ 60). He accuses another legal coordinator, named Omorogbe, of involvement in this theft. (Id.).

On January 12, 2006, Sulehria was denied appointment to the position of Inspector General for the Department of Investigation ("DOI") despite, plaintiff claims, his "superior credentials." (Id. ¶ 61). He claims that the failure by DOI to consider him for the position was in retaliation for his complaints about mistreatment by DOC. (Id.).

On January 13, 2006, he was allegedly told by someone not identified to hand in doctors' notes for work time that he had missed. (Id. ¶ 62). He alleges that in fact he had previously provided those notes and that this new demand was an act of discrimination that resulted in money being deducted from his paycheck. (Id.).

12

On February 15, 2006, Captain Burnett (identified as Murdaugh's supervisor) allegedly falsely accused plaintiff of hiding the prison's notary log book. (Id. ¶ 63). It turned out that the log book was in defendant Murdaugh's desk. (Id.). Later, plaintiff filed another notice of claim, possibly to complain about this harassment. (Id. ¶ 64).

Plaintiff states that, on March 11, 2006, an inmate refused to sign the law library log book and also insulted plaintiff. (Id. ¶ 65). Plaintiff reported the incident in writing, but the captain present at the incident, a man named Phillips, allegedly refused to issue an infraction to the inmate. (Id.).

On April 7, 2006, defendant Murdaugh again allegedly threatened plaintiff, telling him by phone that he would "be kicked out (of here) soon." (Id. ¶ 66).

On May 4, 2006, plaintiff applied for the position of Deputy Commissioner for Public Information. (Id. ¶ 67). He asserts that DOC did not consider his application, and that it refused to do so in retaliation for his prior complaints of discrimination and retaliation. (Id.).

13

On May 20 and 26, 2006, plaintiff says, defendant Thomas falsely accused him of refusing to notarize documents for two different inmates. (Id. ¶¶ 68-69). Five days later, on May 31, 2006, defendants Thomas and Murdaugh allegedly left "a threatening and defamatory sign" of unspecified content on plaintiff's briefcase. (Id. ¶ 70).

Plaintiff also alleges that on a number of occasions between May 19 and June 7, 2006, defendant Thomas falsely listed her departure time in the prison log as five minutes earlier than when she had actually left. (Id. ¶ 71). According to plaintiff, these misstatements were intended to portray him in a bad light since he was responsible for relieving Thomas and the early listed departure time falsely suggested that he had not been present to relieve her when she left. (Id.). According to plaintiff, Thomas did this to retaliate for prior complaints that he had made about her. (Id.).

On August 2, 2006, plaintiff filed still another notice of claim with the City. (Id. ¶ 72). Then, on August 19, 2006, he filed his third set of charges with the EEOC. (Id. ¶ 73). He received a right-to-sue letter from the Commission on September 26, 2006. (Id. ¶ 73).

14

Finally, on January 30, 2007, he was directed by defendant Vengersky to report for a psychological evaluation. (<u>Id.</u> ¶ 74). He says that the notice cited evidence of his increasing hostility, agitation, and delusions, but alleges that defendants ordered the evaluation to rebut the substance of his many complaints since 2002 and as retaliation for those complaints. (<u>Id.</u> ¶¶ 74-75).

Plaintiff asserts that, as a result of his lengthy history of difficulties with DOC, he has suffered a variety of injuries. (<u>Id.</u> ¶ 76). These include loss of income, embarrassment and humiliation, physical and emotional distress, and damage to his reputation. (<u>Id.</u>).

Based on these allegations, plaintiff asserts claims under section 1983 that defendants engaged in discrimination on the basis of his religion, national origin, or ethnicity, that this misconduct was so pervasive as to amount to a hostile work environment, and that defendants retaliated against him for complaining about past wrongs. (<u>Id.</u> ¶¶ 77-84). He seeks to hold the City liable by virtue of its policies and practices and by its failure adequately to train and supervise DOC personnel. (<u>Id.</u> ¶ 81).

Based on these same allegations, plaintiff pursues claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000-e, and New York State and City anti-discrimination laws . (Id. ¶¶ 77-84).


B. Defendants' Motion


Defendants have moved for partial summary judgment. If it were fully granted, the parties would be left to try only plaintiff's Title VII claims against the City for a hostile work environment and for discrimination in work conditions on the basis of race or religion.

In seeking to whittle down the scope of plaintiff's case, defendants press several arguments in their initial papers. First, they assert that plaintiff cannot establish a prima facie case of discrimination under Title VII or its state and local analogs based on defendants' refusal to promote or hire him for the three elevated posts that he mentions in his complaint, since he has not shown that he was qualified for these jobs. They add that, in any event, plaintiff cannot prevail on these claims because defendants had adequate neutral reasons for their promotion and hiring decisions. (Defs.' Mem. Law Supp. Partial Mot. Summ. J.

[hereinafter "Defs.' Mem."] at 3-11). Second, they argue that plaintiff's retaliation claims under Title VII and state and local anti-discrimination laws, insofar as premised on those same refusals to promote or hire him, fail for a similar absence of proof. (Id. at 12-16). Third, they insist that the rest of plaintiff's retaliation claims fail for lack of evidence linking the alleged misconduct to a retaliatory animus and for lack of evidence of any adverse actions. (Id. at 16-18). Fourth, defendants assert that plaintiff fails to plead claims for retaliation under the First, Fourth, and Fifth Amendments. (Id. at 18-21).

Defendants next present a tripartite argument that all of plaintiff's section 1983 claims should be dismissed. They say that these claims were previously dismissed with prejudice, that plaintiff cannot establish the City's liability for constitutional violations under the so-called Monell standards, and that the individual defendants are protected by qualified immunity. (Id. at 21-23).

Finally, defendants contend that all claims that plaintiff asserts against DOC Commissioner Martin Horn should be dismissed for lack of evidence of any personal involvement on his part in the

actions about which plaintiff complains. (Id. at 24-25).[6]

Defendants also assert in passing that the Title VII claims must be dismissed as against the individual defendants because individuals cannot be sued in their individual capacity under Title VII. (Defs.' Mem. at 11 n.5). They also mention briefly that the claims against the DOC should be dismissed, as the Department is not a suable entity. (Id. at 11-12 n.5).

Plaintiff opposes most of the motion. In doing so, however, he concedes that individual defendants cannot be held liable under Title VII. (Pl.'s Mem. Law Opp. Mot. Partial Summ. J. [hereinafter, "Pl.'s Mem."] at 5). He also renounces any retaliation claims under

---

[6] Defendants' memorandum also contained a penultimate argument in favor of dismissal of plaintiff's state and local discrimination and retaliation claims, which they initially claimed are barred by collateral estoppel and the principle of election of remedies. (Defs.' Mem. at 23-24). In a footnote of their reply brief, defendants wisely seek to withdraw these defenses. (Def.'s Reply Mem. at 1 n.1). Defendants previously made the same arguments on their motion to dismiss the predecessor pro se complaint, and this Court addressed those arguments at length on the merits, rejecting the collateral-estoppel argument and upholding the election-of-remedies analysis with respect to those claims that plaintiff had actually asserted before the New York State Division of Human Rights ("SDHR"). (Report & Recommendation, Defs.' Ex. Q at 5-19). Since the District Court adopted that R&R, those ruling are law of the case, and defendants offer no reason why our conclusions in 2006 should be re-examined now.

the First or Fifth Amendment (Pl.'s Mem. at 12 (referring to First and Fifth Amendment claims as "nonexistent," and stating that he is only asserting a constitutional claim under the Equal Protection Clause of the Fourteenth Amendment)).  He is silent as regards the status of DOC. Otherwise, he resists pre-trial disposition of any of his claims, contending that he has defined triable issues of fact with respect to all of them.

<u>ANALYSIS</u>

Before addressing defendants' individual challenges to portions of plaintiff's case, we summarize the oft-repeated standards for assessing a summary-judgment motion. We then turn to defendants' arguments in the order in which defendants invoke them.

A. <u>Summary Judgment Standards</u>

The court may enter summary judgment only if it concludes that there is no genuine dispute as to the material facts and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Feingold v. New York</u>, 366 F.3d 138, 148 (2d Cir. 2004). It is axiomatic that the role of the

19

court on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Howley v. Town of Stratford, 217 F.3d 141, 150-51 (2d Cir. 2000).

The party moving for summary judgment bears the initial burden of informing the court of the basis for his motion and identifying those portions of the "pleadings, the discovery and disclosure materials on file, and any affidavits" that demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); accord Celotex, 477 U.S. at 323; Koch v. Town of Brattleboro, 287 F.3d 162, 165 (2d Cir. 2002). In making this judgment, the court must view the record in the light most favorable to the non-moving party. E.g., Hunter v. Bryant, 502 U.S. 224, 233 (1991); O'Hara v. Weeks Marine, Inc., 294 F.3d 55, 61 (2d Cir. 2002). If the non-moving party has the burden of proof on a specific issue, the movant may satisfy his own initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. Celotex, 477 U.S. at 322-23, 325; PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002); Goenaga v.

20

March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).
If the movant fails to meet his initial burden, however, the motion
will fail even if the opponent does not submit any evidentiary
materials to establish a genuine factual issue for trial. See,
e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 161 (1970);
Giannullo v. City of New York, 322 F.3d 139, 140-41 (2d Cir. 2003).

If the moving party carries his initial burden, the opposing
party must then shoulder the burden of demonstrating a genuine
issue of material fact. E.g., Beard v. Banks, 548 U.S. 521, 529
(2006); Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001). To
demonstrate a "genuine dispute," the opposing party must "do more
than simply show that there is some metaphysical doubt as to the
material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574, 586 (1986); accord Woodman v. WWOR-TV, Inc., 411 F.3d
69, 75 (2d Cir. 2005). He must come forward with sufficient
evidence to permit a reasonable jury to return a verdict in his
favor. Anderson, 477 U.S. at 242, 248; Matsushita, 475 U.S. at 587;
Byrnie v. Town of Cromwell, 243 F.3d 93, 101 (2d Cir. 2001); see
also Woodman, 411 F.3d at 75 (court must "distinguish between
evidence that allows for a reasonable inference of discrimination
and evidence that gives rise to mere speculation and conjecture").
Alternatively, if "the party opposing summary judgment propounds a

21

reasonable conflicting interpretation of a material disputed fact," summary judgment must be denied. Schering Corp. v. Home Ins. Co., 712 F.2d 4, 9-10 (2d Cir. 1983); accord Rogath v. Siebenmann, 129 F.3d 261, 267 (2d Cir. 1997); R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997).

In meeting this burden, the opposing party need not present evidence in a form that would be admissible at trial. Celotex, 477 U.S. at 324. However, he cannot rely merely on allegations in his pleadings and denials of the factual assertions of the movant. Fed. R. Civ. P. 56(e)(2). Rather, he must, by his own affidavits, or by the depositions, answers to interrogatories, and admissions, present specific evidence in support of his contention that there is a genuine issue of fact for trial. Celotex, 477 U.S. at 324 (citing Fed. R. Civ. P. 56(e)). Any affidavits offered by the non-moving party must be made on the basis of personal knowledge. Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (citing Fed. R. Civ. P. 56(e)).

B. The Promotion/Hiring Claims

Plaintiff alleges that he was denied appointment to three positions for which he applied. Two of those would have represented

a promotion within the DOC and the third would have involved a new hiring by the DOI. According to plaintiff, the failure to promote or hire him for these positions represented unlawful discrimination on the basis of religion, race, or national origin, or else constituted acts of retaliation for his complaints about prior misdeeds by DOC personnel.

Before applying the Rule 56 standards to the current record, we summarize the legal criteria by which a Title VII claim such as those asserted by plaintiff must be judged. Those standards have been frequently articulated and reflect an oft-described burden-shifting process, which applies equally to claims of discrimination under the New York State Executive Law and the New York City Human Rights Law. E.g., Dawson v. Bumble & Bumble, 398 F.3d 211, 217 (2d Cir. 2005).

To prevail on a Title VII claim for disparate treatment based on race, national origin, or religion, plaintiff must demonstrate that he was subjected to an adverse employment action and that his race or national origin or religion was a motivating factor in the action. Weeks v. New York State, 273 F.3d 76, 85 (2d Cir. 2001) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). Direct evidence that the adverse employment action was

motivated by discrimination, "a smoking gun," is typically unavailable, however. Holcomb v. Iona Coll., 521 F.3d 130, 141 (2d Cir. 2008) (quoting Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991)); see also Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 464-65 (2d Cir. 1989) ("[E]mployers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law."). To show discriminatory intent through circumstantial evidence, a plaintiff must take the first step of proving a prima facie case. Reeves v. Sanderson Plumbing, 530 U.S. 133, 142 (2000); Windham v. Time Warner, Inc., 275 F.3d 179, 187 (2d Cir. 2001).

Plaintiff's burden to establish a prima facie case is minimal. E.g., Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981); Weinstock, 224 F.3d at 42. He need only demonstrate that he belongs to a protected class, that he was subjected to adverse action by his employer in connection with his job performance, and that this action took place in circumstances suggesting that it was motivated by race-, national-origin- or religion-based animus. See, e.g., Farias v. Instructional Sys., Inc., 259 F.3d 91, 98 (2d Cir. 2001).[7] In the context of denial of

---

[7] The elements of a prima facie case are stated in occasionally varying ways, but these differences reflect the fact that the

a promotion or hiring, he must show (1) that he is a member of a protected class, (2) that he applied for and was qualified for a position that the employer was seeking to fill, (3) that he was denied the position, and (4) that the position remained open and the employer continued to seek applicants having plaintiff's qualifications. Petrosino v. Bell Atlantic, 385 F.3d 210, 226 (2d Cir. 2004); Mauro v. S. New Eng. Telecomms. Inc., 208 F.3d 384, 386 (2d Cir. 2000).

If the plaintiff makes this showing, the defendant is required to proffer evidence that its actions were in fact motivated by a neutral, or non-discriminatory, purpose. E.g., Reeves, 530 U.S. at 142; Weinstock, 224 F.3d at 42. If the defendant can articulate such a reason for its actions, the burden-shifting process is at an end, and the presumption of discrimination drops out, leaving the plaintiff with the obligation of demonstrating that discriminatory animus was a motivating factor behind the decision. Id. (citing inter alia St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 519 (1993)).

---

criteria are somewhat flexible in nature and will vary to a degree depending upon the circumstances. E.g., Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002) (quoting inter alia Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)).

To avoid summary judgment, the plaintiff is not required to show that the employer's proffered reasons played no role in the employment decision, but he must produce sufficient evidence of discrimination to permit a rational trier of fact to conclude that the prohibited factor was at least one of the motivating factors. Holcomb, 521 F.3d at 138 (citing Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203 (2d Cir. 1995); Holtz v. Rockefeller & Co., 258 F.3d 62, 78 (2d Cir. 2001); Fields v. New York State Off. of Mental Retardation, 115 F.3d 116, 121 (2d Cir. 1997)).

The plaintiff might seek to carry this burden by adducing evidence that the employer's proffered reason is unworthy of credence; this is simply one form of circumstantial evidence of discriminatory animus. Reeves, 530 U.S. at 147 (citing St. Mary's Honor Ctr., 509 U.S. at 517). In some cases, the evidence constituting the plaintiff's prima facie case may be sufficient to satisfy this burden without more. Cronin, 46 F.3d at 203 (citing St. Mary's Honor Ctr., 509 U.S. at 511; Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1226 (2d Cir. 1994)); accord Carras v. MGS 782 Lex, Inc., 310 Fed. Appx. 421 (2d Cir. 2008). Moreover, if the plaintiff produces evidence demonstrating that the defendant's proffered explanation is pretext, the jury may, if it chooses, rely on it as circumstantial evidence that discriminatory

animus was in fact one factor motivating the decision. <u>Reeves</u>, 530 U.S. at 146. In any event, "[i]t is not enough ... to <u>dis</u>-believe the employer; the factfinder must <u>believe</u> the plaintiff's explanation of intentional discrimination." <u>Id.</u> at 147 (quoting <u>St. Mary's Honor Ctr.</u>, 509 U.S. at 519 (emphasis in original))).

A claim of retaliation under Title VII is analyzed in somewhat similar fashion. To establish a <u>prima facie</u> case of retaliation, the plaintiff must demonstrate (1) that he engaged in protected activity,[8] (2) that the employer knew of his participation in the protected activity,[9] (3) that the employer thereafter subjected him

_____

[8] "Protected activity" refers to certain action taken by the plaintiff to protest or oppose statutorily prohibited discrimination. <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 566 (2d Cir. 2000) (citing <u>inter alia</u> 42 U.S.C. § 2000e-3). To establish that an activity was protected, a plaintiff need only prove that he was acting under a good-faith belief that the activity was of the kind covered by the statute. E.g., Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993).

[9] The plaintiff need not necessarily show that the specific agents of the employer who carried out the adverse action knew of the protected activity; general knowledge by the employer as an entity is sufficient to satisfy this element of a <u>prima facie</u> case. <u>Gordon v. New York City Board of Educ.</u>, 232 F.3d 111, 116-17 (2d Cir. 2000) (collecting cases). However, where there is evidence that the agents who carried out the adverse action were unaware of the plaintiff's protected activity, it may be difficult for the plaintiff to satisfy his burden on causation, the fourth element of a <u>prima facie</u> case. <u>See id.</u> at 117 (holding that evidence of agents' lack of knowledge of employee's protected activity is admissible to counter employee's showing of causal connection).

to an adverse action[10], and (4) that "a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer." Gordon, 232 F.3d at 116; accord, Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000). Plaintiff may establish a causal connection either directly, through proof of retaliatory animus, or indirectly, through circumstantial evidence that, for example, the adverse action followed close on the heels of the protected activity, or that the employer also took adverse action against other employees who engaged in protected conduct. Gordon, 232 F.3d at 117; Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990).

If the plaintiff meets this initial burden, the employer is required to articulate a bona fide non-retaliatory reason for the adverse action that it took with respect to the plaintiff. E.g., Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 443 (2d Cir. 1999) (citing Gallagher v. Delaney, 139 F.3d 338, 349 (2d Cir. 1998)). Upon the proffer of such a neutral reason, the burden returns to the plaintiff to prove that retaliation was a

---

[10] As we will discuss below, the adverse action requirement is more easily satisfied in a retaliation claim than in a discrimination claim in that it is not limited to employment actions. There is no dispute, however, that a denial of promotion or employment satisfies the requirement of an adverse action for both types of claims.

motivating factor in the employer's decision. E.g., Gordon, 232 F.3d at 117-18 (citing Fields v. New York State Off. of Mental Retardation, 115 F.3d 116, 121 (2d Cir. 1997)). Plaintiff need not show that retaliation was the sole motive for the adverse action, but must show that it was a motivating factor. Gordon, 232 F.3d at 117 (citing Cosgrove, 9 F.3d at 1039; Fields, 115 F.3d at 120).[11]

With these standards in mind, we assess each of the three job opportunities separately.

## 1. Director of Planning and Administration

Plaintiff complains that he was not promoted from his job as a legal coordinator to the position of DOC Director of Planning and Administration in October 2004. (Am. Compl. ¶ 42). On their motion, defendants argue (1) that plaintiff has not demonstrated -- and, indeed, cannot demonstrate -- that he was qualified for the

---

[11] The court may, in some circumstances, apply the so-called mixed-motive analysis, in which the defendant must demonstrate that even if a retaliatory or discriminatory motive may have played a part, it would have reached the same decision absent such malign motivation. See, e.g., Stratton v. Dep't for the Aging, 132 F.3d 869, 878 & n.4 (2d Cir. 1997). Such an approach may be followed, even absent defendant's consent, if there is clear evidence of a discriminatory or retaliatory animus. See Fields, 115 F.3d at 121-22.

position (Defs.' Mem. at 4, 5); (2) that there is no triable dispute as to the fact that DOC had a non-discriminatory reason for its hiring decisions -- namely, the superior credentials of the person appointed (id. at 6, 7); and (3) that plaintiff cannot demonstrate that this neutral reason was a pretextual mask for discriminatory or retaliatory animus. (Id. at 7). In opposing this argument with regard to all three job applications, plaintiff principally offers what appears to be a non sequitur -- that he is complaining of an entire range of adverse conduct by DOC personnel amounting to a hostile work environment. (Pl.'s Mem. at 18-20). He further argues that he is asserting that defendants failed to consider him for these positions -- not merely that they rejected his applications -- and that this distinction relieves him of the burden of demonstrating either his qualifications or the pretextual nature of defendants' proffered reason for rejecting him. (Id. at 21).

We start by rejecting plaintiff's suggestion, ungirded by any legal authority, that his claims of failure to promote or hire are somehow subsumed in a hostile-environment claim and thus need not meet the criteria for a failure-to-promote or denial-of-hiring

claim.[12] He has asserted separate claims for the failure to hire him for these three positions, and those claims are governed by recognized legal standards, which he must meet. Similarly baseless is his related contention that his claims are based on a failure by defendants to consider his job applications rather than their rejection of those applications, and that this distinction jettisons any obligation by him to establish that he was qualified for the positions or that the proffered rationales for promoting or hiring someone else were pretexts for discrimination or retaliation. Again, this jesuitical hairsplitting is recognized by no legal authority of which we are aware -- predictably, plaintiff cites none -- and that in itself is hardly surprising. Were it otherwise, any plaintiff unhappy with an employer's failure to hire or promote him could label his claim as one for failure to consider him for hiring or promotion, and thereby evade the basic and long-recognized criteria for pursuing such a claim.[13]

---

[12] As noted, defendants do not seek summary judgment on Sulehria's hostile-environment claim.

[13] We note as well that plaintiff has testified that he in fact submitted job applications to the appropriate authorities, and that they denied him the positions (Pl.'s Ex. 2, Pl.' Dep., at 170 lines 15-18, 173 lines 23-25, 174 lines 1-7, 180 lines 12-18), and he has elsewhere characterized defendants' conduct as having "denied" him the desired job slots. (Pl.'s Rule 56.1 Statement ¶¶ 8, 11, 16). In short, he has effectively said that they denied his applications.

As for plaintiff's efforts to meet the requirements of this claim, they fail as a matter of law. The job posting for Director of Planning and Administration specified the following qualifications:

> 1. A baccalaureate degree from an accredited college with specialization in public or business administration, sociology, criminology, mathematics, statistics, or related fields and two years of full-time paid experience in public or business administration, community relations, social work, mathematical or statistical research including one year in a supervisory capacity; or
>
> 2. An associate degree from an accredited community college and six years of experience as described above; or
>
> 3. A satisfactory equivalent combination of education and experience, but all candidates must . . . have one year of experience as described above in a supervisory capacity.

(Defs.' Ex. E). The only evidence plaintiff has proffered that might demonstrate that he was qualified for the position consists of his own testimony during his deposition that he was qualified (Pl.'s Ex. 2 at 170-71) and the resume and cover letter he allegedly submitted with his application. (Defs.' Ex. D).

Plaintiff's resume indicates that he has a master of law degree from Touro College, "an accredited . . . law school," but does not specify where he obtained his bachelor's degree. (Defs.' Ex. D at 1786). In his deposition, he seemed to take the position

that, since he had demonstrated that he had an LLM degree from an accredited school -- a degree that was "above" a bachelor's or associate's degree -- it was unnecessary to identify the provenance of his bachelor's degree. (Pl.'s Ex. 2 at 171 lines 24-25, 172 lines 1-8). It is well settled that, in determining whether an employee is qualified for a position, courts look to the criteria the employer has specified for the position. E.g., Santos v. Engelhard Corp., 2009 WL 2432736, at *8 (S.D.N.Y. Aug. 6, 2009) (collecting cases). Moreover, employers have broad discretion to determine the necessary job qualifications. Milano v. Astrue, 2008 WL 4410131, at *32 (S.D.N.Y. Sept. 26, 2008) (citing Byrnie, 243 F.3d at 103 (stating that a court "must respect the employer's unfettered discretion to choose among qualified candidates" when a court is evaluating whether employer's purported reason was pretextual); O'Leary v. New York State Unified Court Sys., No. 05 Civ. 6722, 2007 WL 2244483, at * 7 (S.D.N.Y. Aug. 6, 2007) (employer's decisions regarding qualifications "are entitled to deference"); Ferguson v. Barram, No. 98 Civ. 5368, 2000 WL 375243, *7 (S.D.N.Y. Apr. 11, 2000) (stating that when there is nothing in the record to suggest discrimination, the court should defer to the employer's business judgment)). However, here, in light of the fact that the job posting provided for some trade-off between education in the relevant fields and experience, plaintiff's argument might

not have been wholly without merit if he had demonstrated that his LLM degree was in one of the areas of study listed in the job posting -- a list that did not include "law." However, he did not show this. His cover letter and resume fail to identify where in his education he obtained the relevant training in one of the areas of specialization sought by defendants. In his deposition, plaintiff stated that his "bachelor of laws degree covers criminology and sociology and administration" (Pl.'s Ex. 2 at 172, lines 15-16), although this information appears nowhere in his resume or cover letter. Even if this self-serving testimony could be considered as some evidence that he did indeed possess a degree in one of the fields desired by defendants, it is questionable, to say the least, whether this manner of demonstrating his qualifications could ever support an inference of discrimination given that he did not bother to make defendants aware in his application of the fact that he possessed the requisite specialization.

We need not decide, however, whether plaintiff proffered sufficient evidence that he met the education requirement, because he has clearly failed to demonstrate that he possesses the requisite work experience. Plaintiff's cover letter and resume both assert, without further explanation, that he has thirteen years of

34

experience in the fields of law, planning, and administration.[14] Plaintiff seems to believe that his bare assertion that he possesses the required qualifications, divorced from any details about where and how he acquired them, was all that was required of him at the application stage. As he explained in his deposition, he believed he did not need to offer specific evidence of his qualifications until he was being interviewed for the position. (Pl.'s Dep., Defs.' Ex. B/Pl.'s Ex. 2, at 173).

This belief fundamentally misunderstands the role played by job applications in the process of screening candidates. At any rate, we need not grapple here with whether his assertions are sufficient evidence of his educational qualifications to survive summary judgment, as there are yet more ways in which plaintiff failed to make out a <u>prima facie</u> case.

As defendants note, plaintiff's resume does not in any way indicate satisfaction of the requirement for two years <u>of paid employment</u> in any of these areas nor the requirement of at least

---

[14] His resume describes it as "more then [sic] thirteen years" (Defs.' Ex. D at 1787) and his cover letter describes that experience as being in the fields of criminology, mathematics, and statistics as well as law, planning, and administration (<u>id.</u> at 1785), parroting the language of the job posting almost verbatim.

one year of paid employment with the requisite supervisory responsibilities. (Defs.' Mem. at 5). Indeed, the only specific reference to employment in plaintiff's resume is a mention of his job as legal coordinator for DOC, a job that he has not shown met the requirements for the Director of Planning and Administration position.

Plaintiff does not specifically dispute any of these omissions from his application or seek to offer additional specific evidence of his qualifications. He has plainly failed to meet even the minimal burden of a prima facie case. In any event, defendants have proffered a concededly adequate neutral reason for hiring someone else, and plaintiff fails to create a triable issue as to the bona fides of that explanation.

The explanation for the decision was offered by Kathleen Coughlin, the DOC Deputy Commissioner for Programs and Discharge Planning, who was responsible for making the hiring decision when she was Assistant Commissioner for Discharge Planning. (Coughlin Decl. ¶¶ 1-3). In her declaration she reports, without meaningful contradiction, that she selected Ms. Desiree Shaw as the best candidate, based in significant part on Ms. Shaw's more than five years experience in "overseeing division budget operations,

monitoring and evaluating the procurement of purchase orders, and preparing narrative and statistical reports on division spending with the Strategic Planning and Programs Unit of DOC." (Id. ¶ 3). According to Ms. Coughlin, this experience was particularly important because the position required a high level of skill in a number of administrative areas, including budgetary supervision and maintenance and the preparation of reports and "high level communications on behalf of the Assistant Commissioner," areas in which Ms. Shaw had extensive experience and demonstrated skills. (Id. ¶ 4).

This explanation is both facially neutral, as plaintiff admits[15], and not contradicted by any evidence in the record. The closest thing to a response that plaintiff offers is his conclusory assertion that he believes that Commissioner Horn was involved in the decision, and that the Commissioner was aware that he was a Muslim and had filed complaints about the Department. (Pl.'s Dep., Defs.' Ex. B/Pl.'s Ex. 2, at 167-170). Plaintiff offers no competent evidence that the Commissioner was responsible for the decision, and plaintiff's bare assertion as to this is not entitled

---

[15]   See Pl.'s Mem. at 21 ("[A]ny legitimate reasons offered by the Defendants as to why they hired the people they did are wholly irrelevant.").

to be weighed in his favor on summary judgment. <u>See</u>, <u>e.g.</u>, <u>Union Ins. Soc. of Canton, Ltd. v. William Gluckin & Co.</u>, 353 F.2d 946, 952 (2d Cir. 1965) ("Conclusory statements and statements not made on personal knowledge do not comply with the requirements of Fed. R. Civ. P. 56(e) . . . ."). Indeed, plaintiff has offered no evidence that the decision to hire Ms. Shaw was for reasons other than those stated by Ms. Coughlin or that Ms. Coughlin even knew of his participation in a protected activity before she made the decision to promote someone else, much less direct evidence that the decision was influenced by animus to plaintiff's race, national origin, or religion or his challenges to the conduct of DOC personnel.

In short, plaintiff fails to meet his burden both at the <u>prima facie</u> stage and at the pretext stage. Accordingly, summary judgment is appropriately granted on his claims of discrimination and retaliation arising out of the denial of his application for the position of Director of Planning and Administration.

2. <u>Inspector General</u>

Plaintiff asserts that, in January 2006, the DOI denied him the position of Inspector General with the New York City Economic

Development Corporation because of his religion and in retaliation for his complaints about DOC mistreatment of him. (Am. Compl. ¶ 61). Again, he fails to carry his prima facie burden of demonstrating that he was qualified for the job, and equally fails to show that the neutral reason proffered by the decision-maker was a pretext for discrimination or retaliation.

The job posting for this slot specified a set of requirements that included:

> 1. A baccalaureate degree from an accredited college and five years of full time experience in investigation, auditing, law enforcement, law, finance investment banking, banking or real estate finance; at least 18 months of which must have been in a supervisory, administrative, managerial or executive capacity; or
> 2. Education and/or experience equivalent to "1" above.

(Defs.' Ex. G). In response to this posting, plaintiff submitted a resume and a cover letter. (Defs.' Ex. F). The resume, again, does not reflect that he graduated from an accredited college, stating only that he received a B.A. degree from an unidentified college, apparently in Pakistan, and a master's degree in U.S. Legal Studies from an accredited law school. (Defs.' Ex. F. at 1152). Moreover, although the cover letter parrots the posting by saying, in conclusory terms, that he had more than "fifteen (15) years of experience in the fields of law, investigation, auditing and real

estate related developments and transactions" (id. at 1150) and that he had "worked in supervisory, administrative, managerial and executive capacities" (id.), his resume fails to identify the source or details of any such experience or even to state in a conclusory fashion that his experience in a supervisory capacity amounted to the required 18 months. The evidentiary record is equally silent on these matter.

Apart from plaintiff's failure to offer competent evidence that he met the specified qualifications for the job, he fails to put in question the bona fides of the defendants' explanation for their choice to fill the slot. As Ms. Cynthia Mathis, the DOI Director of Human Resources, explains, DOI did not hire anyone as Inspector General in response to the posting. (Mathis Decl. ¶ 6). Rather, some months later, in June 2006, DOI appointed Gia L. Morris, Esq. -- then a DOI employee -- as acting Inspector General for the New York Economic Development Corporation. (Id.). That appointment is entirely understandable in view of Ms. Morris's experience, as indicated by the record. At the time of her appointment, she was serving as DOI Inspector General for the New York City Department of Finance, a job that included responsibility for "the supervision of auditors, investigators and attorneys, [and] conducting investigations of fraud, corruption, abuse of

authority, illegal use of government funds, conflicts of interest and gross mismanagement." (Id.). Moreover, Ms. Morris had substantial additional experience in investigations of a criminal or similar nature, having served for three years in the Kings County District Attorney's Office and having worked subsequently for four years at a law firm, including work involving white-collar crimes and investigations. (Id. ¶ 7).

In view of the uncontroverted evidence of Ms. Morris's abundant pertinent experience, DOI obviously had ample grounds to appoint her as acting Inspector General for the Economic Development Corporation. Moreover, plaintiff offers no evidence that her obvious qualifications -- and plaintiff's lack of such experience -- formed only a pretextual explanation for the decision not to hire him and later to appoint her, or that the failure to choose him reflected discriminatory animus or a retaliatory motive.

In short, this hiring claim should be disposed of on summary judgment.

3. DOC Deputy Commissioner for Public Information

The third position to which plaintiff aspired, which forms the

41

basis for another failure-to-promote claim, is that of DOC Deputy Commissioner for Public Information. Again, plaintiff claims that the denial of his application reflects discriminatory animus or retaliatory motivation. (Am. Compl. ¶ 67). Defendants seek summary judgment on the basis that plaintiff cannot show that he was qualified for the position or that the neutral reason proffered by defendants for the DOC hiring decision was a pretext for discrimination or retaliation. We agree.

The criteria for the job were summarized in the job posting, which specified:

> 1. A Baccalaureate degree from an accredited college with 24 credits in English, journalism or public relations, plus five (5) years of full-time paid experience in public relations, journalism or advertising, including two (2) years in an administrative, supervisory or consultative capacity; or

> 2. A combination of education and/or experience which is equivalent to "1" above. Graduate study in English, journalism or public relations may be substituted for up to one year of required experience. However, all candidates must have at least two (2) years of administrative, supervisory or consultative experience in public relations, journalism or advertising.

(Defs.' Ex. H). Plaintiff submitted a resume in response to this posting, and it listed his B.A. degree from an unidentified college, his law degree from a Pakistani law school, his LLM from

Touro College, his employment as a lawyer in Pakistan, and his work as a legal coordinator for DOC. (Defs.' Ex. I/Pl.'s Ex. 12 at 973). In addition, plaintiff inserted in the resume a lengthy handwritten statement containing a bare assertion that he had "MORE THAN 15 YEARS OF EXPERIENCE IN THE FIELDS OF LAW AND JOURNALISM FOR MORE DETAILS SEE INFRA." (Id. at 974). Additional handwritten notations contained no such details, instead asserting in equally conclusory terms, for example, that "I HAVE TRAINED THOUSANDS OF STUDENTS IN LEGAL RESEARCH METHODOLOGY AND JOURNALISM" (id.); "I HAVE COMPREHENSIVE AND SUBSTANTIAL KNOWLEDGE OF PUBLIC RELATIONS PROCEDURES AND PRACTICES. FURTHER, I HAVE EXTENSIVE KNOWLEDGE OF CRIMINAL JUSTICE POLICIES ESPECIALLY AS THEY IMPACT ON DEPARTMENTAL POLICY" (id. at 975); and "I HAVE EXCELLENT WRITING SKILLS. I HAVE BEEN CONSIDERED AN ORATOR OF THE FIRST WATER. I HAVE WON MANY MEDALS AND AWARDS IN THE FIELDS OF JOURNALISM, PUBLIC SPEAKING AND LAW." (Id. at 977-78).

The record before us contains no competent evidence whatsoever that plaintiff had the specific credentials mentioned in the posting notice, including a B.A. degree from an accredited college; the specified 24 credits in English, journalism, or public relations; the requisite full-time, paid experience in any of those fields; or the required supervisory, administrative, or

consultative roles in those vocations. When asked at his deposition to explain how his resume and cover letter demonstrated that he satisfied the job requirements, he simply asserted that he was more than qualified, and that if the DOC was interested in his qualifications it should have interviewed him. (Pl.'s Dep., Defs.' Ex. B/Pl.'s Ex. 2, at 174-76). In short, plaintiff fails to meet even his initial burden to demonstrate that he was qualified for the position.

In any event, defendants proffer a neutral reason for their hiring selection, and plaintiff again fails to offer any factual basis on which a trier of fact could conclude that the explanation is a pretext for discrimination or retaliation. Commissioner Horn notes that he made the hiring decision and selected Steven J. Morello as the most qualified candidate based on Mr. Morello's extensive thirty years of experience "in strategic communication planning and execution." (Horn Decl. ¶ 5). That is certainly a neutral reason, and plaintiff proffers no basis for inferring that this explanation was a mask for discriminatory animus.

4. <u>Conclusion on Promotion/Hiring Claims</u>

For the reasons noted, we have determined that plaintiff has

failed to demonstrate any triable dispute with respect to his discrimination and retaliation claims premised on the DOC's failure to promote him and the DOI's failure to hire him, and we further conclude that, on the undisputed facts, defendants are entitled to judgment as a matter of law.[16]

## C. The Remaining Title VII Retaliation Claims

In plaintiff's amended complaint, he characterizes certain of the alleged harassing incidents as retaliatory in nature. These include the asserted refusal of some staffers to give him a key to a staff bathroom on several occasions in September 2003 and once in August 2004 (Am. Compl. ¶¶ 29-31, 37); the alleged denial of his overtime requests in May 2004 (id. ¶ 33); the asserted instruction by the Director of Law Libraries, defendant Karen Powell, that he make his leave requests two weeks in advance (id. ¶ 54); and the January 30, 2007, directive that he undergo a medical evaluation. (Id. ¶ 74).

---

[16] In view of our analysis, we need not address defendants' separate argument that, insofar as these claims are premised on a retaliation theory, they fail at the prima facie stage because plaintiff cannot demonstrate, as is his burden, that the adverse employment actions were taken in circumstances indicating a retaliatory motive. (See Defs.' Mem. at 12-15).

Defendants seek summary judgment on this congeries of retaliation claims while conceding that these incidents may be relevant to plaintiff's hostile-environment claim. In targeting the retaliation variant of the claims, defendants proffer an array of arguments. First, they assert that plaintiff offers no evidence of a causal link between these actions and any protected activity. (Defs.' Mem. at 16). Second, they argue that, except for the supposed denial of overtime and the referral of plaintiff for a medical evaluation, none of the alleged misconduct constitutes an adverse action for purposes of a retaliation claim. <u>Id.</u> Third, insofar as the medical referral is concerned, they suggest that, under Title VII analysis, the claim must fail because (1) DOC has articulated an adequate non-retaliatory purpose for the required examination -- plaintiff's apparent change in behavior and indications of mental stress -- and (2) plaintiff has in fact conceded that he was undergoing such stress and anxiety at the time. (<u>Id.</u> at 17-18).

Plaintiff responds to these arguments initially by asserting that the cited instances of allegedly retaliatory harassment are pertinent to his hostile-environment claim. (P.'s Mem. at 18-20). Without specifically addressing whether the reference for a psychological evaluation satisfies the "adverse action" requirement

for this claim, he further argues that the circumstances permit the inference that the reference was made in response to his prior complaints of mistreatment. (See id. at 20). As for the other cited instances of retaliation, plaintiff does not address the causation issue -- that is, whether they were motivated by retaliatory animus -- but rather, argues that, whether or not minor, they cumulatively are sufficient to constitute adverse action. (Id. at 22).

Plaintiff's arguments are, in part, beside the point. The relevance of the psychological evaluation to his hostile-environment claim is off point since defendants' motion does not challenge that claim. Moreover, the difficulty with aspects of his retaliation claims resides in his inability to demonstrate a causal link between his protected activity and some of the instances of alleged harassment as well as his failure to demonstrate a triable issue as to whether some of the cited actions amounted to adverse actions for purposes of a retaliation claim.

The alleged denials of a key to a bathroom on a few occasions were apparently the act of low-level DOC employees, and plaintiff has offered no evidence that the persons responsible were even aware of, much less motivated by, his prior filing of agency charges or complaints about other DOC employees. Although plaintiff

47

need not necessarily show that the specific agents of the employer who carried out the adverse action knew of the protected activity, plaintiff must produce some evidence demonstrating the existence of a causal connection between the protected activity and the adverse action. See Gordon, 232 F.3d at 116-17. Plainly, he has failed to do so with respect to denial of bathroom access. Similarly, he offers no evidence that the requirement by defendant Powell that he submit leave requests in advance or the asserted failure by defendants Triplett and Powell to respond to his overtime requests in the single month of May 2004 were products of a desire to retaliate against him for his filings.

In addition, plaintiff fails to offer evidence to demonstrate that these specific actions were sufficiently serious to amount to adverse actions for purposes of a retaliation claim. In reaching that conclusion, we note that the "adverse action" element is defined somewhat differently in a retaliation context from what is required to demonstrate an adverse employment action as a predicate for a Title VII discrimination claim. In the latter case, the plaintiff must show that the allegedly discriminatory action impacted "the terms and conditions of employment," that is, "the employee's 'compensation, terms, conditions or privileges of employment." 42 U.S.C. § 2000e-2(a); see, e.g., Weeks, 273 F.3d at

48

85. The Supreme Court has held, however, that to pursue a retaliation claim, the plaintiff need not demonstrate that the adverse action affected "the terms and conditions of employment," but must show that the action was sufficiently severe in context to permit a trier of fact to conclude that "a reasonable employee would have found the challenged action materially adverse, 'which in this context means it might well have "dissuaded a reasonable worker from making or supporting a charge of discrimination."'" Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006); Washington v. Illinois Dep't of Revenue, 420 F.3d 658, 662 (7th Cir. 2005)). The anti-retaliation provision of Title VII seeks to "prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms" rather than to "immunize [employees] from those petty slights or minor annoyances that often take place at work and that all employees experience." Id.

Plaintiff offers no evidence suggesting that the denial of a key to a particular employee bathroom on several occasions was sufficiently serious to meet this test. He similarly fails to demonstrate that a trier of fact could find that the two-week requirement for requesting leave, or the failure to honor his overtime request during a one-month period, had the potential to

49

dissuade a reasonable employee from pursuing or supporting a Title VII claim.

The referral for a psychological evaluation was potentially an adverse action in that, depending on the circumstances, it might have persuaded a reasonable employee to desist from complaining, see Dodd v. SEPTA, 2008 WL 2902618, at *14 (E.D. Pa. July 24, 2008), and defendants do not argue otherwise. Similarly, the alleged refusal of overtime was an adverse action.

In challenging the viability of these two retaliation claims, defendants assert, as noted, the absence of a provable causal link to any protected activities. With regard to the psychological evaluation, they also assert that plaintiff has not met his burden to create a triable issue as to whether the rationale for referring him for that evaluation was pretextual.

Causation for purposes of a retaliation claim may be shown by direct proof of retaliatory animus by those undertaking the adverse actions or by circumstantial evidence, including by demonstrating that other employees similarly situated but who did not engage in protected conduct were treated more favorably, or, notably, by showing that the protected activity was followed rapidly by the

adverse action. <u>E.g.</u>, <u>Sumner v. U.S. Postal Serv.</u>, 899 F.2d 203, 209 (2d Cir. 1990); <u>Decintio v. Westchester County Med. Ctr.</u>, 821 F.2d 111, 115 (2d Cir. 1987). When plaintiff relies solely on temporal proximity to show a causal relation, that "temporal proximity must be 'very close'". <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273 (2001).

Plaintiff fails to cite any evidence of disparate treatment between activist and passive employees in his circumstances, and he also proffers no direct evidence of retaliatory animus by the people responsible for the denial of overtime or for the requirement of a psychological evaluation. As for proximity between the protected activity and the adverse action, both of his claims fail.

The denial of overtime allegedly occurred in May 2004, whereas the protected activity that plaintiff cites as triggering retaliation was his filing a notice of claim on June 17, 2002. (<u>See</u> Pl.'s Rule 56.1 Statement at ¶ 1.1). The passage of nearly two years between the protected activity and the adverse action is plainly far too long to offer adequate circumstantial evidence of causation to survive summary judgment. <u>See</u>, <u>e.g.</u>, <u>Woods v. Enlarged City Sch. Dist. of Newburgh</u>, 473 F. Supp. 2d 498, 528-29 (S.D.N.Y.

2007) (collecting cases) (five-month gap between protected activity and adverse action exceeds temporal limit for circumstantial inference of retaliatory motivation); <u>Clayborne v. OCE Bus. Servs.</u>, 2008 WL 2971770, at *3 n.8 (S.D.N.Y. July 31, 2008) (nine-month gap between complaint and termination too remote to establish causal connection); <u>Moses v. City of New York</u>, 2007 WL 2600859, at *3 (S.D.N.Y. Aug. 28, 2007)(thirteen-month gap does not permit inference of discrimination).

As for the notice to undergo a psychological evaluation, although the time gap between the last preceding protected activity and the directive to plaintiff was shorter, it still exceeds the generally permissible time frames for invoking a presumption. The last protected acts cited by plaintiff were the filing of agency charges and a notice of claim on August 2 and 19, 2006 (Am. Compl. ¶¶ 72-73; Pl.'s Rule 56.1 Statement ¶ 1.1), whereas the notice for a psychological evaluation was not issued until January 30, 2007, more than five months later. (Am. Compl. ¶ 74).

Furthermore, the retaliation claim concerning the psychological evaluation fails as well for lack of evidence of pretext. Defendants proffer a neutral reason for the referral, which is recited at considerable length and in great length in the

notice to plaintiff. (Defs.' Ex. T, Attach. A). According to that notice, the evaluation was required because of a pattern of behavior by plaintiff involving "increasingly confrontational and combative actions directed toward the staff and inmates creat[ing] a security concern" and suggesting serious emotional problems on his part that led the Department to question whether he was "presently . . . capable of performing the necessary duties of a legal coordinator." (Id. at 2). Moreover, the catalogue of actions described in this account is at least consistent with plaintiff's contention that his exposure to an allegedly hostile work environment has caused him "severe stress, apprehension, and anxiety," with resultant mental distress and psychological and emotional injuries. (Am. Compl. ¶ 76).

Plaintiff has failed, on the current motion, to point to any other evidence in the record that suggests that the proffered rationale for the psychological referral was pretextual. He instead seems to argue, first, that defendants' proffer of this report is insufficient to meet their burden on the question of pretext. Plaintiff criticizes the reliance of defendants on the report itself in lieu of an affidavit, even though he effectively concedes that it is an authentic DOC document. (Pl.'s Mem. at 20). However, the document itself satisfies defendants' burden, which is simply

53

to articulate a neutral reason for the action. See, e.g., Reeves, 530 U.S. at 142 (stating that defendants' burden -- to produce evidence of  legitimate reason -- is "one of production, not persuasion" that "'can involve no credibility assessment.'" (quoting St. Mary's Honor Ctr., 509 U.S. at 509)). If the decision-makers in DOC had reason for concern that plaintiff might be undergoing undue stress, they had a colorable reason to demand an evaluation. While plaintiff presumably would challenge the accuracy of some of the contents of the report, he does not proffer any evidence of his own to challenge the bona fides of the decision to assess his capacity to continue to perform his work. It also bears mention that the record does not reflect that the evaluation led to any action being taken against Sulehria. This reinforces the case for the legitimacy -- that is, the non-retaliatory nature -- of the directive that he undergo an evaluation.

Plaintiff also argues in his brief that this report is itself evidence that the psychological referral was retaliation for his complaints. (See Pl.'s Mem. at 20). In cataloguing the behavior that gave rise to the  referral, the report does spend a great deal of time discussing plaintiff's many complaints, in addition to discussing instances of plaintiff's open hostility or refusal to follow orders. (Defs.' Ex. T, Attach. A passim). However,

plaintiff's interpretation of this report is unsupportable. Nothing in the report suggests that he is being referred for psychological testing as punishment for these complaints or to deter further complaints. Rather, the report cites his complaints in conjunction with other factors, such as plaintiff's earlier behavior and the conflicting factual accounts of other DOC employees, as evidence of a sudden change in his behavior (id. at 3, 7), obsession (id. at 10), paranoia (id. at 10), growing disillusionment (id. at 11), and his highly emotional state (id. at 5, 11) -- all legitimate reasons for being concerned about plaintiff's mental fitness for his position. Plaintiff contends that these legitimate reasons for concern were not what truly motivated defendants, but he does not point to any evidence to support this contention, relying only on his own bare assertion that this is so. His bare allegations are insufficient to demonstrate a triable issue of fact on the question of pretext. See Fed. R. Civ. P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.").

Perhaps aware of this obvious failure, plaintiff further argues, in essence, that it would be unfair to allow defendants to meet their burden by relying on his emotional instability and hostility as chronicled in the report, since these problems were, plaintiff claims, caused by defendants' own creation of a hostile work environment. (See Pl.'s Mem. at 20). However, he offers no legal authority in support of the proposition that this court should ignore defendants' proffer of a legitimate, nondiscriminatory reason for the referral under the circumstances of this case (as plaintiff alleges them to be), and we know of none.

Necessarily, this version of plaintiff's retaliation claim must fail for his failure to demonstrate a genuine issue of fact as to defendants' reason for the psychological referral as well as for his failure to establish a causal connection between his protected activity and the referral.

D. The Constitutional Retaliation Claims

As a separate matter, defendants seek summary judgment on plaintiff's retaliation claims insofar as they are asserted under various constitutional provisions. In his response, plaintiff

56

states that he has not asserted claims of retaliation under the First and Fifth Amendments, but rather has limited himself to invoking the Fourteenth Amendment, including specifically the Equal Protection Clause. (Pl.'s Mem. at 12). This appears to be a quibble, at best, since his complaint explicitly articulates a First Amendment retaliation claim, asserting that defendants violated his rights under the First and Fourteenth Amendments by virtue of policies that discriminate against people of Pakistani descent and Muslims and by the practice of "retaliating against such individuals for complaining about such discriminatory practices."[17] Plainly he is alleging that he was targeted for protesting his alleged mistreatment by other DOC personnel.

---

[17]   The relevant paragraph of the amended complaint reads:

> By reason of the foregoing, the Defendants have intentionally or with reckless indifference abridged and violated Sulehria's federally protected rights secured by the First, Fourth, and Fourteenth Amendments to the Constitution of the United States under color of law, according to a policy, custom or practice of discriminating against individuals of Pakistani descent, of Muslim religion, and retaliating against such individuals for complaining about such discriminatory practices.

(Am. Compl. ¶ 81). It is unclear how either of the alleged policies of discrimination and retaliation would violate the Fourth Amendment. Defendants seem to have proceeded on the assumption that plaintiff intended to write "Fifth" Amendment here. (See Defs.' Mem. at 18-19).

Anticipating that plaintiff will pursue a constitutional retaliation claim, defendants assert that the First Amendment claim fails because whatever speech plaintiff is invoking is not public speech and hence not within the purview of a First Amendment retaliation claim by a government employee. (Defs.' Mem. at 18-20). As for the other cited amendments, defendants say they do not provide a legal basis for a retaliation claim of this type. (Id. at 21).

Defendants' attack on the retaliation variant of plaintiff's section 1983 case appears to be well grounded. The only speech that plaintiff cites as a possible motivator for retaliation involved his personal complaints, including his filings with the SDHR, the EEOC and the City, about his own treatment at the hands of DOC personnel. His complaints, however, do not come within the rubric of speech by the employee "as a citizen addressing matters of public concern," as required for a First Amendment claim by a public employee. Garcetti v. Ceballos, 547 U.S. 410, 417 (2006).

Although the fact that plaintiff's motive in filing these complaints was primarily personal is not dispositive in determining whether his speech touched matters of public concern, this is nonetheless relevant to our analysis. See Sousa v. Roque, 578 F.3d

164, 169-174 (2d Cir. 2009). Other factors for consideration are the form and content of plaintiff's speech. Id. at 170 (citing Connick v. Myers, 461 U.S. 138, 147-48 (1983)). A consideration of the relevant factors in this case leads to the conclusion that none of Sulheria's complaints addressed matters of public concern, and thus are not protected by the First Amendment.

Plaintiff's administrative complaints consist mostly of a recitation of many instances of alleged hostility or mistreatment directed at him personally, and which apparently affected only him. (E.g., SDHR Compl. ¶ 3, Defs.' Ex. J at 1 ("I have been harassed and respondent has created a hostile work environment for me.")). Of course, he includes in each of his lengthy complaints an allegation to the effect that "I am being subjected to a hostile work environment because of my race, color, national origin, creed, and in retaliation for opposing discrimination" (SDHR Compl. ¶ 7, Defs.' Ex. J, at 2). This assertion in his complaints may well render that harassment legally actionable if he can prove it, but it creates only a loose connection between the particulars of his relationship with his employer and the broader societal interest in combating discrimination, and is insufficient to render his allegations of harassment "a matter of public concern" meriting constitutional protection. See, e.g., Ruotolo v. City of N.Y., 514

F.3d 184, 190 (2d Cir. 2008) ("generalized public interest in the fair or proper treatment of public employees is not enough" to constitute speech on matter of public concern). Compare Pappas v. Giuliani, 290 F.3d 143, 152 (2d Cir. 2002) (collecting cases demonstrating that complaints of racial discrimination by public employees are not necessarily matters of public concern) with McGrath v. Nassau Health Care Corp., 217 F. Supp. 2d 319, 327-28 (E.D.N.Y. 2002) (collecting cases showing that complaints about system-wide, pervasive discrimination may constitute matters of public concern).

As for the Fifth and Fourteenth Amendments, neither supports a claim of retaliation on these facts. See, e.g., Bernheim v. Litt, 79 F.3d 318, 323 (2d Cir. 1996) ("we know of no court that has recognized a claim under the equal protection clause for retaliation following complaints of racial discrimination"); Levine v. McCabe, 357 F. Supp. 2d 608, 621-22 (E.D.N.Y. 2005) (citing id.); cf. Lefkowitz v. Turley, 414 U.S. 70 (1973) (recognizing prohibition on retaliation by government for exercise of Fifth Amendment privilege against self-incrimination). In this regard we emphasize that the Equal Protection Clause, embodied in both amendments, may be available to support a properly documented claim of impermissible discrimination if undertaken under color of state

law -- as plaintiff notes in his responsive papers (<u>see</u> Pl.'s Mem. at 14) -- but to the extent that plaintiff may be seeking to assert these provisions in support of a retaliation claim, that effort would be unsuccessful.


E. <u>Plaintiff's Other Section 1983 Claims</u>


Defendants next argue that all of plaintiff's section 1983 claims should be dismissed on one of several grounds. First, they contend that plaintiff's conspiracy claims, as embodied in his prior <u>pro se</u> complaint, were dismissed with prejudice in a prior court order, and hence that he may not raise them now. (Defs.' Mem. at 22). They also argue for the first time in their reply brief that plaintiff has not set forth any evidence to demonstrate a conspiracy. (Defs.' Reply Mem. at 8). Next, they assert that his claims against the City under section 1983 should be disposed of on summary judgment because plaintiff cannot establish the requisites for <u>Monell</u> liability. (Defs.' Mem. at 22). Finally, they argue in abbreviated terms that the individual defendants are entitled to qualified immunity because "[p]laintiff proffers no evidence that the actions of any individual defendants were incompetent or in violation of law . . . ." (Defs.' Mem. at 23). We address each of these items <u>seriatim</u>.

61

1. <u>Conspiracy</u>

In 2006, the court granted that part of the defendants'
12(b)(6) dismissal motion that targeted plaintiff's section 1983
conspiracy claims because they were pled in conclusory terms.
(Report & Recommendation, Defs.' Ex. Q at 29-30). Although the
Report & Recommendation ("R&R") did not specify the nature of the
recommended dismissal of those section 1983 claims, the District
Court explicitly dismissed them with prejudice. (Order, Dec. 22,
2006). The R&R rejected, however, one aspect of the defendants'
conspiracy argument, which sought dismissal of a claim under 42
U.S.C. § 1985. (<u>Id.</u> at 30). In defendants' initial moving papers on
the current motion, they invoke only the prior dismissal with
prejudice of the section 1983 conspiracy claims.

In opposing this aspect of defendants' motion, plaintiff
contends that there is evidence in the record of a conspiracy.
(Pl.'s Mem. at 17). On reply, defendants shift ground, arguing that
such a claim must be asserted under section 1985 rather than
section 1983, and that plaintiff has not proffered "evidence to
demonstrate a conspiracy." (Defs.' Reply Mem. at 8).

The current version of the complaint does not plead a claim for conspiracy and does not mention section 1985. Nonetheless, reading it and the motion papers together, we infer -- as even defendants do -- that plaintiff does seek to assert a conspiracy claim. Moreover, the fact that it may be labeled as arising under section 1983 rather than 1985 is not fatal since the courts look to the facts pled rather than the legal label affixed to the allegations. See, e.g., Morris v. Schroder Capital Mgmt. Int'l, 445 F.3d 525, 530 n.3 (2d Cir. 2006) ("A complaint need not set out the correct legal theory on which the claim is based, so long as the complaint provides full notice of the circumstances giving rise to the plaintiff's claim"); Phillips v. Girdich, 408 F.3d 124, 128 (2d Cir. 2005) (directing courts to read all complaints liberally in accordance with the "fundamental command of the Federal Rules of Civil Procedure . . . never to exalt form over substance").

Finally, to the extent that defendants argue in reply that plaintiff's claim must fail for lack of proof, their challenge must be rejected since the argument was first made in a reply memorandum of law. Simply stated, since the motion did not challenge the evidentiary basis of the posited conspiracy claim, plaintiff was not called upon to proffer evidence in its support. See, e.g., Tischmann v. ITT/Sheraton Corp., 145 F.3d 561, 568 n.4 (2d Cir.

63

1999) (citing United States v. Gabriel, 125 F.3d 89, 100 n.6 (2d Cir. 1997)) (argument in appellate reply brief deemed waived); Curto v. Med. World Commc'ns, Inc., 388 F. Supp. 2d 101, 109 n.2 (E.D.N.Y. 2005).


2. Monell


Plaintiff is asserting section 1983 claims against the City for the alleged misconduct of DOC personnel. Defendants contend in their motion that plaintiff cannot establish the prerequisites for such municipal liability. We agree.


To establish the City's liability on these claims, plaintiff must show that it bore some responsibility for violations of his constitutional rights. E.g., City of Canton v. Harris, 489 U.S. 378, 385 (1989) ("[A] municipality can be found liable under section 1983 only where the municipality itself causes the constitutional violation at issue.") (emphasis in original). To do so, he must demonstrate both a constitutional violation and a sufficient causal relationship between the violation and a municipal policy or practice. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978); Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983).

Plaintiff may demonstrate the existence of a policy or practice in a variety of ways. First, he may provide evidence of a formal policy officially adopted by the municipality. Monell, 436 U.S. at 690. Second, a single unconstitutional act or decision, when taken by an authorized decision-maker, may be considered policy and thus subject a municipality to liability. Bd. of County Comm'rs v. Brown, 520 U.S. 397, 404-06 (1997); Pembaur v. City of Cincinnati, 475 U.S. 469, 481-84 (1986). Third, a policy may be established by showing that the acts of the municipal agent were part of a widespread practice that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware. Bd. of County Comm'rs, 520 U.S. at 403-04; City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988); Monell, 436 U.S. at 690-91. Fourth, where a municipality's failure to provide adequate training or supervision of its agents rises to the level of deliberate indifference, section 1983 liability may lie against the municipality. Brown, 520 U.S. at 407; City of Canton, 489 U.S. at 388. Finally, we note that "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." DeCarlo v. Fry, 141 F.3d 56, 61 (2d Cir. 1998) (quoting Ricciuti v. New York City Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991)).

The first step in a <u>Monell</u> analysis is to determine whether agents of the City have violated the plaintiff's constitutional rights. If so, the question remains as to the role, if any, of City policy or practice in bringing about those illegal acts. <u>See</u>, <u>e.g.</u>, <u>Amnesty Am. v. Town of W. Hartford</u>, 361 F.3d 113, 123-31 (2d Cir. 2004) (analyzing first whether plaintiffs had shown a violation of their constitutional rights and then analyzing plaintiffs' theories of municipal liability). Plaintiff has a triable case on his claim that he was targeted because of his religion, race, or national origin, and since the alleged malefactors were City employees, such misconduct could amount to a violation of plaintiff's equal-protection rights under the Fourteenth Amendment. <u>See</u>, <u>e.g.</u>, <u>Demoret v. Zegarelli</u>, 451 F.3d 140, 149 (2d Cir. 2006) (municipal agent's creation of hostile work environment is a form of discrimination prohibited by Equal Protection Clause). Hence the remaining question is whether plaintiff has proffered sufficient evidence to permit a trier of fact to find that the City bore some legal responsibility for those alleged violations of his rights.

The short answer is that plaintiff does not meaningfully attempt to do so. Rather, he initially asserts that defendants must offer evidence to establish that the City is not liable. (Pl.'s Mem. at 13). This misconstrues plaintiff's burden in this

circumstance. Defendants contend that there is no evidence of a policy or practice that would authorize, encourage, or acquiesce in the sort of misconduct to which plaintiff alleges he was exposed. Because plaintiff bears the ultimate burden at trial of proving the existence of a basis for Monell liability, defendants have met their initial Rule 56 burden. See, e.g., Celotex, 477 U.S. at 322-23 (moving party entitled to summary judgment when nonmoving party has failed to make sufficient showing on essential element of her case on which she has burden of proof); In re Dana Corp., 574 F.3d 129, 147 (2d Cir. 2009) (citing Celotex, 477 U.S. at 322-23).

Plaintiff fails to proffer any such evidence on this motion, instead drawing the court's attention solely to his allegations that he was harassed over a period of time and that his complaints were not followed up. (See Pl.'s Mem. at 17). As plaintiff correctly notes, proof of "a widespread practice" may reflect City policy. (See id. at 16 (citing cases)). But plaintiff fails to identify in the record any such evidence of a pattern of misconduct by DOC that might support a circumstantial case for a policy or practice, and likewise fails to point to any evidence of the authorization or encouragement of such misconduct by a final policy

maker.[18] Rather, in his brief in opposition to defendants' motion for summary judgment, plaintiff merely directs the court's attention to allegations in his complaint that, he contends, if proved, would demonstrate the existence of a widespread policy giving rise to <u>Monell</u> liability. (<u>See</u> Pl.'s Mem. at 17).

The Second Circuit has observed, "Federal Rule of Civil Procedure 56 does not impose an obligation on the court considering a motion for summary judgment to perform an independent review of the record to find proof of a factual dispute." <u>In re Agent Orange Prod. Liab. Litig.</u>, 517 F.3d 76, 92 n.14 (2d Cir. 2008) (quoting <u>Amnesty Am.</u>, 288 F.3d at 470). Since plaintiff has not pointed to any evidence supportive of this claim, he has not carried his burden, and summary judgment is appropriate on this claim.

3. <u>Qualified Immunity</u>

Defendants' remaining argument in support of the complete dismissal of the section 1983 claims is that the individuals whom plaintiff has sued are protected by qualified immunity. This

---

[18] Plaintiff has not even suggested that he has a basis for municipal liability premised on a failure to train or supervise DOC personnel, and he has offered no evidence to that effect in any event.

argument is, for summary-judgment purposes, a non-starter.

The individual defendants all argue that they are entitled to qualified immunity in this action. (Defs.' Mem. at 22). Individual defendants "are shielded from liability for civil damages" under section 1983 if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 614 (1999) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); Gilles v. Repicky, 511 F.3d 239, 243 (2d Cir. 2007) (same). "To be clearly established, 'the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Anderson v. Recore, 446 F.3d 324, 333 (2d Cir. 2006) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

A public official is thus entitled to qualified immunity if (1) his or her conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him or her to believe that his or her actions were lawful at the time of the challenged act. Jenkins v. City of New York, 478 F.3d 76, 87 (2d Cir. 2007); Field Day, L.L.C. v. County of Suffolk, 463 F.3d

69

167, 191 (2d Cir. 2006); Curry v. City of Syracuse, 316 F.3d 324, 334 (2d Cir. 2003).

Plaintiff's surviving claims under section 1983 are based on the contention that the individual defendants denied him his right to equal protection by discriminating against him, or exposing him to a hostile environment, on the basis of his race, national origin, or religion. Defendants do not contend that a reasonable trier of fact could not find that plaintiff suffered such a violation on the basis of the facts alleged.[19] We turn, therefore, to whether the right was clearly established. "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct." Anderson, 317 F.3d at 197.

There is no question that the courts have long recognized that the Equal Protection Clause protects individuals from intentional discrimination under color of state law on the basis of race, national origin, or religion. See, e.g., Hayden v. County of

---

[19] The only individual defendant who seeks dismissal on the merits of all claims is Commissioner Horn, and he does so only on the basis that he did not participate in any of the alleged misconduct by DOC personnel. We address that argument below.

Nassau, 180 F.3d 42, 48 (2d Cir. 1999) (citing Adarand
Constructors, Inc. v. Pena, 515 U.S. 200, 213, 227-29 (1995); Yick
Wo v. Hopkins, 118 U.S. 356, 373-74 (1886); Vill. of Arlington
Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-65 (1977));
see also Demoret, 451 F.3d at 149 (municipal agent's creation of
hostile work environment is a form of discrimination prohibited by
Equal Protection Clause). Indeed, defendants do not argue
otherwise.

    The only question posed by defendants's motion on this point
is whether it was objectively reasonable for them to believe that
their acts were lawful. The initial problem with defendants'
position on this issue is that they utterly fail to discuss it in
other than the vaguest and most conclusory terms and point to no
evidence to support the affirmative defense that they now invoke.
In their opening brief they assert simply that plaintiff has not
proffered evidence "that the actions of any individual defendants
were incompetent or in violation of law." (Defs.' Mem. at 23). What
these phrases mean in context and what actions alleged by plaintiff
are targeted by them is left entirely to the reader's imagination.
Since defendants bear the burden of persuasion on this defense,
their skeletal assertion represents a patent failure to carry their
initial burden on their summary-judgment motion. Moreover,

plaintiff in response proffers evidence, principally in the form of his own testimony, that he was subjected to a series of abusive acts which he asserts were based on his race, national origin, or religion, and defendants, by not explicitly addressing that case at any point in their motion papers, implicitly concede that it is triable. If so, they cannot sustain their implicit contention that such misconduct, if based on the forms of animus cited by plaintiff, would be protected by an immunity defense.

Indeed, even in reply defendants offer no explanation as to why such alleged discriminatory misconduct -- supposedly illustrated in a plethora of incidents over a period of years -- would uniformly constitute behavior that DOC personnel could reasonably believe to be lawful. Rather, they again revert to boilerplate conclusions devoid of any specifics, and, still worse, the boilerplate appears to have been pulled from the wrong brief bank. Thus, before reiterating their prior one-sentence conclusion about the absence of proof of their "incompeten[ce]"[20] or "violation

---

[20] Defendants seem to have built their qualified immunity argument in large part on a quotation from Malley v. Briggs, 475 U.S. 335 (1986). In that case, in rejecting petitioner's argument that an officer applying for a warrant should be shielded by absolute immunity, the Supreme Court observed in passing that "[a]s the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley, 475 U.S. at 341. Viewed in

of the law," defendants offer a quote from St. Louis v. Praprotnik, 485 U.S. at 130, to the effect that "[b]efore the actions of subordinate city employees can give rise to § 1983 liability, their discriminatory practice must be so manifest as to imply the constructive acquiescence of senior policy-making officials." (Defs.' Reply Mem. at 10). As is evident from the substance of the quotation and the decision itself, this refers to the question of municipal liability under Monell and has nothing to do with the qualified-immunity defense of the individual defendants.

We cannot say for certain whether defendants might ultimately have a viable immunity defense. What is apparent, however, is that they have not sought in any meaningful fashion to establish its basis on the current motion. The record evidence now before us precludes granting summary judgment on that defense, since "[w]here the circumstances are in dispute, and contrasting accounts present factual issues as to the [unconstitutionality of the action], a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity." Curry v. City of Syracuse, 316 F.3d 324, 334 (2d Cir. 2003) (quoting Mickle v. Morin, 297 F.3d 114, 122

---

its proper context, it is clear that Malley does not support defendants' contention that competence is the standard for granting qualified immunity. Nor do defendants explain what competence or incompetence would even mean in this context.

(2d Cir. 2002)) (denying summary judgment on qualified-immunity defense to excessive-force claim because facts were in dispute regarding degree of force and reasonableness); see also Weyant v. Okst, 101 F.3d 845, 858 (2d Cir. 1996) (denying summary judgment on qualified-immunity grounds, stating: "[t]he matter of whether it was reasonable for the officers to believe their actions met the standards set by those principles depends on whether one believes their version of the facts. That version is sharply disputed, and the matter of the officers' qualified immunity therefore cannot be resolved as a matter of law."). At a minimum, plaintiff has proffered some evidence in support of his equal-protection claims, and defendants have not explained why the record as it now stands permits the findings required for upholding the immunity defense on summary judgment. This aspect of defendants' motion should therefore be denied.

F. Commissioner Horn

Finally, defendants seek dismissal of plaintiff's claims against DOC Commissioner Martin Horn. (Defs.' Mem. at 24). They premise this application on his having borne no responsibility for any alleged misconduct with respect to plaintiff except for his conceded role in choosing the Deputy Commissioner for Public

Information. (Defs.' Mem. at 24-25; Defs.' Reply Mem. at 10). As to the claims arising out of plaintiff's application for that position, we have already agreed that they should be disposed of by summary judgment. See supra pp. 41-44.

Defendants' articulation of their argument leaves some ambiguity as to its precise grounds, since they principally refer to plaintiff's failure to allege Horn's participation -- thus implying a Rule 12(b)(6) ground for dismissal[21] -- but they also refer at times to plaintiff's failure to offer proof of such a role.[22] In fairness, though, since plaintiff cites evidentiary material in his response (see Pl.'s Mem. at 6), we infer that he

---

[21] See Defs.' Mem. at 25 ("Plaintiff . . . fails to allege personal involvement . . . ."); Defs.' Reply Mem. at 10 ("This is insufficient to state a claim for personal involvement against Commissioner Horn."). Similarly, several of the cases defendants cite involved dismissals for defective pleading, as opposed to grants of summary judgment. (E.g., Defs.' Mem. at 24-25 (citing Alfaro Motors v. Ward, 814 F.2d 883, 886-87 (2d Cir. 1987) (affirming dismissal of claims against defendant because complaint was defective on its face); Richards v. City of N.Y., 2007 U.S. Dist. LEXIS 23726 (S.D.N.Y.2007) (same)); Defs.' Reply Mem. at 10 (citing Rivera v. Goord, 119 F. Supp. 2d 327, 344-45 (S.D.N.Y. 2000) (dismissing claims because of defective complaint))).

[22] See Defs.' Mem. at 25 (". . . record is devoid of any evidence that Commissioner Horn had any personal involvement . . ."); id. at 25 (citing Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996) (affirming grant of summary judgment to defendant who was not personally involved); Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (same)).

was sufficiently on notice that defendants are pressing a Rule 56 argument.

As for the substance of the issue, plaintiff seeks to ensnare defendant Horn based on his having allegedly failed to act on complaints that plaintiff assertedly communicated to him about his mistreatment. (Pl.'s Mem. at 6 (Commissioner Horn "failed and refused to take appropriate remedial action"; "failed and refused to take any action, basically ignoring Plaintiff"; "is liable . . . for failing to investigate and remedy Plaintiff's complaints")). Plaintiff's proffer -- favorably read -- suggests that the Commissioner could be viewed as having failed to correct constitutional violations of which he had actual notice, and acted in a grossly negligent in managing subordinates in this respect. Defendants argue that this is an insufficient basis for the imposition of supervisory liability.

Under traditional Second Circuit precedent, if proven, plaintiff's allegations may have in fact been an adequate basis for supervisory liability. See, e.g., Iqbal v. Hasty, 490 F.3d 143, 152-53 (2d Cir. 2007), rev'd sub nom. Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009) (stating that defendant could be liable under section 1983 if he failed to remedy constitutional violation after learning

of it or was grossly negligent in managing subordinates who caused violation); Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (same).

The difficulty for plaintiff on this point is that earlier this year the Supreme Court rejected these standards for imposing supervisory liability on an individual defendant, at least in an Equal Protection context. In reversing the Second Circuit's decision in Iqbal, the Supreme Court squarely rejected the argument that a supervisor could be held liable for violating the Equal Protection Clause on the basis of "mere knowledge of his subordinate's discriminatory purpose." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). In Iqbal, the High Court emphasized that liability under section 1983 required proof that the defendant was directly involved in the misconduct, either by participating in it or ordering or authorizing it. Id. Plaintiff offers no evidence that Commissioner Horn was involved in the misconduct, as distinguished from merely failing to correct or end it.[23] Under the Supreme Court's recent analysis, Commissioner Horn's alleged role appears to be insufficient to hold him liable for the incidents about which plaintiff complains.

---

[23] Nor, we note, does plaintiff even allege this.

77

Accordingly, summary judgment should be granted dismissing plaintiff's section 1983 claims against Commissioner Horn.


H. <u>Miscellaneous Matters</u>


The parties appear not to be in disagreement on two issues. We agree with their conclusions on both accounts. First, the individual defendants are not subject to liability on plaintiff's Title VII claims. <u>See</u>, <u>e.g.</u>, <u>Mandell v. County of Suffolk</u>, 316 F.3d 368, 377 (2d Cir. 2003) (individual actors not subject to Title VII liability in their personal capacities). Second, the DOC is not a suable entity, and hence it must be dismissed as a defendant. <u>E.g.</u>, <u>Pressley v. Green</u>, 2004 WL 97701, at *2 (S.D.N.Y. Jan. 16, 2004) (stating that under New York City charter, DOC is not a suable entity); <u>Warner v. Vill. of Goshen Police Dep't</u>, 256 F. Supp. 2d 171 (S.D.N.Y. 2003) (administrative arms of a municipality, such as village police department, do not have legal identity separate and apart from municipality, and cannot sue or be sued); <u>see also</u> <u>Ricketts v. City of Hartford</u>, 74 F.3d 1397, 1400 n.1 (2d Cir. 1996) (observing in dictum that Hartford Police Department "presumably" would not be an appropriate defendant separate from City of Hartford itself).

CONCLUSION

_____

_____For the reasons stated above, we recommend that defendants'
motion for summary judgment be granted in part and denied in part.
In short, we recommend that the complaint be dismissed except for
the following: (1) plaintiff's Title VII discrimination and
hostile-environment claims against the City (except those based on
the denial of hiring or promotion, which should be dismissed); (2)
plaintiff's section 1983 equal-protection claims against the
individual defendants (except his equal-protection claims for
denial of hiring or promotion and his equal-protection claims
against Commissioner Horn, which should be dismissed); (3)
plaintiff's discrimination claims under State and City law (other
than claims for denial of hiring or promotion, or against
Commissioner Horn, or which were previously dismissed as having
been encompassed in the 2004 SDHR charge, which should all be
dismissed); and (4) plaintiff's conspiracy claim under 42 U.S.C. §
1985.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure,
the parties shall have ten (10) days from this date to file written
objections to this Report and Recommendation. Such objections shall
be filed with the Clerk of the Court and served on all adversaries,

with extra copies to be delivered to the chambers of the Honorable

Sidney H. Stein, Room 1010, and to the chambers of the undersigned,

Room 1670, 500 Pearl Street, New York, New York, 10007-1312.

Failure to file timely objections may constitute a waiver of those

objections both in the District Court and on later appeal to the

United States Court of Appeals. Fed. R. Civ. P. 72, 6(a), 6(d);

28 U.S.C. § 636(b)(1); see also Thomas v. Arn, 474 U.S. 140, 150

(1985), reh'g denied, 474 U.S. 1111 (1986); Small v. Sec'y of

Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

**DATED: New York, New York**
**October 13, 2009**

RESPECTFULLY SUBMITTED,

**MICHAEL H. DOLINGER**
**UNITED STATES MAGISTRATE JUDGE**

Copies of the foregoing Report and Recommendation have been mailed
today to:

Steven A. Morelli, Esq.
One Old Country Road
Carle Place, New York 11514

Kevin A. Madden, Esq.
Assistant Corporation Counsel for the City of New York
100 Church Street
Room 2-122
New York, New York 10007-2601